IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| United States of America, | ) | |
| Plaintiff, | ) ) | CR 14-02147-TUC-RCC(EJM) |
| vs. | ) ) | **REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO DETERMINE COMPETENCY** |
| Joshua Lee Andrew Merritt, | ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

Pending before the Court is defense counsel's motion to determine the defendant's competency to stand trial pursuant to 18 U.S.C. § 4241. This motion involves a rather unique interplay between strong and unwavering religious beliefs and a mental disease or defect. The precise issue is whether the defendant's belief that God will intervene and the pending charges will be dismissed stems from a mental disease or defect that renders him unable to assist his attorney properly in the defense of this case. Defense counsel maintains that the defendant's total refusal to discuss the plea offer, assist in trial preparation, or discuss trial strategy, are the product of a mental disease or defect which manifests itself in the defendant's irrational belief that the charges against him will be dismissed. The government contends that the medical evidence establishes that the defendant does not suffer from a mental disease or defect, he is intelligent and understands the legal process, and is able, but not willing, to communicate with his attorney about the plea offer and assist his attorney in preparing for trial.

For the reasons stated below, the Court finds that the defendant does not suffer from

a mental disease or defect that makes him unable to properly assist his attorney at trial; rather, this Court finds that the defendant is fully able to assist his attorney in properly defending this case, but is unwilling to do so. While this unwillingness makes it difficult for the defense attorney to represent the defendant on these very serious charges, it does not amount to incompetence under 18 U.S.C. § 4241. Accordingly, this Court recommends that the District Court find that the defendant is competent to stand trial.

**The Instant Charges:**

On December 4, 2014, the defendant was arrested for distributing child pornography in violation of 18 U.S.C. § 2252. [Doc. 1.] A criminal complaint alleging this federal offense was sworn to on December 5, 2014, and the defendant had his Initial Appearance on the same date. The defendant was temporarily detained pending his preliminary hearing and detention hearing set for December 9, 2014 before this Court. [Doc. 2.] On that date, the defendant waived his right to a preliminary hearing and was ordered detained pending trial as a danger to the community.[1] [Doc. 5.] The defendant appealed the detention order to the District Court and on January 20, 2015, the District Court ordered the defendant released to the supervision of Pretrial Services on certain conditions. [Doc. 15.] The defendant was released from custody on January 22, 2015, and has been in compliance with his pretrial release conditions since his release from custody over a year ago.

**Motion for a Competency Examination and Dr. Kaempf's Report:**

On August 31, 2015, defense counsel filed a motion for a competency examination of the defendant, which was granted by the District Court on September 4, 2015. [Doc. 57.] Dr. Aimee C. Kaempf performed the competency examination and issued a report dated October 23, 2015, which addressed her findings and the defendant's competency to stand trial. Dr. Kaempf did not provide an opinion as to whether she believes the defendant is

---

[1] On 12/23/14, a federal grand jury in Tucson, Arizona returned a three-count indictment against the defendant charging him with the following offenses: Distribution and Possession of Child Pornography [Doc. #9.]

competent to stand trial. (Ex. A. at 11; 12/16/15 Tr. at 5.) [2] Rather, she sets forth her findings that the defendant is intelligent and understands the charges and court process, as well as her concerns regarding the defendant's ability to assist his counsel in the defense of this case.

Dr. Kaempf first concluded that the defendant is able to understand the nature and consequences of the proceedings against him, and demonstrates a solid understanding of the current charges, possible verdicts, potential consequences, and the basics of the legal system and courtroom proceedings. (Ex. A at 11.) However, Dr. Kaempf also notes that the defendant appears limited in his ability to rationally assist properly in his defense due to magical thinking, ideas of reference, and grandiosity which have been diagnosed as Schizotypal and Narcissistic personality traits that could also represent early symptoms of a psychotic illness. (*Id.*) She further notes that the defendant's tendency to view his case as exceptional or unique combined with his strong religious convictions, ideas of reference, magical thinking, and rigidity have led him to refuse to consider a plea bargain or assist in trial preparation. (*Id.*) She concludes that this refusal to engage in these discussions do not appear to be based in reality and are contradictory to statements he has made regarding his desire to defend himself and his belief that he should be acquitted. (*Id.*) Although it may be possible that the defendant may be choosing not to cooperate with his attorney based on his strong religious convictions and maladaptive personality traits, she notes that the striking resoluteness and contradictory nature of his decisions coupled with evidence of underlying mental illness and possible prodromal psychosis raise significant concerns about his ability to assist properly in his defense. (*Id.*)

**Testimony Presented at the Evidentiary Hearing on December 16, 2015:**

Because Dr. Kaempf's report did not provide an opinion as to competency to stand trial, an evidentiary hearing was set for December 16, 2015. Dr. Kaempf testified at that hearing, as did Dr. Paul Simpson, the psychologist who conducted a psychosexual and

---

[2] "Ex." (followed by a letter) refers to the exhibits admitted at the evidentiary hearings on the competency motion. "12/16/15 Tr." refers to the transcript of the evidentiary hearing held on December 16, 2015.

1 psychosocial evaluation of the defendant. In the report of his evaluation, Dr. Simpson first
2 raised concerns about the defendant's competency. (*See* Ex. B and Ex. C.)[3]

3 Dr. Simpson testified that he did not conduct a competency examination of the
4 defendant, and if asked to do so he would utilize additional tests to help determine
5 competency. (12/16/15 Tr. at 14, 19, 22-23, 46.) As part of his psychosexual evaluation,
6 Dr. Simpson met with and interviewed the defendant on two occasions and also met with the
7 defendant's mother. (*Id*. at 11.) With respect to his findings that gave rise to his concern
8 about the defendant's competence, Dr. Simpson found that while the defendant denies
9 depression, his mother reported depressive symptoms, and testing did show some depressive
10 symptoms. (*Id.* 13.) Dr. Simpson also found schizoid and narcissistic personality traits --
11 *i.e,*. a tendency to be removed from relationships and a feeling that he is special and God will
12 intervene -- but neither rise to the level of a diagnosis for schizoid or narcissistic personality
13 disorder. (*Id.* at 15.) Dr. Simpson also noted some avoidant personality traits, like avoiding
14 conflict or negative situations by not dealing with them. (*Id.* at 16-18.) For instance, the
15 defendant's refusal to take medication for his diabetes or take recommended anti-depressants.
16 (*Id.* at 17.) Dr. Simpson was concerned that the defendant was using the same avoidant traits
17 with respect to the pending criminal charges by refusing to embrace the reality of what he
18 is facing and not following his attorney's advice. (*Id.* at 17-18.)

19 Notwithstanding his concerns about the defendant's failure to follow his attorney's
20 advice, Dr. Simpson did not opine that the defendant is unable to do so because his sincere
21 religious beliefs stem from a mental illness. (*Id.* at 36, 55, 70.) Ironically, Dr. Simpson
22 testified that he was a member of the same Pentecostal church attended by the defendant and
23 his family, and agrees that it is difficult to distinguish between sincerely held religious beliefs
24 and a mental illness. (*Id.* at 39, 42, 55, 58.) Dr. Simpson noted that part of the Pentecostal
25 belief system is "divine healing," rather than traditional medicine, which could explain the

---

27,28 [3] Exhibit C is the report of Dr. Simpson's psychosexual and psychosocial evaluation which notes his concerns about competence; Exhibit B is Dr. Simpson's supplemental report prepared at defense counsel's request which further addresses competency concerns.

1 defendant's refusal to medicate for diabetes and depression. (*Id.* at 41-42.) Dr. Simpson
2 acknowledged that the defendant's church community and family's attitudes make it even
3 more difficult for this defendant to admit to the alleged child pornography offenses. (*Id.* at
4 43.) Finally, Dr. Simpson noted that the defendant's mother shares the same belief that faith
5 in God will resolve the pending case, and these beliefs can also be a learned familial pattern.
6 (*Id.* at 47-48.)

7 Although Dr. Kaempf did not reach a conclusion as to competency in her report, she
8 testified that she believes the defendant is incompetent because he is unable to assist his
9 attorney as a result of his depression and the schizotypal and narcissistic personality traits she
10 identified in her report. (*Id.* at 78-85). She based this conclusion on the defendant's "ideas
11 of reference" (experiencing innocuous events or coincidences as having strong personal
12 significance) and "magical thinking" (believing that God will intervene and his case will be
13 dismissed). (*Id.* at 80- 82.) While Dr. Kaempf did not see any evidence of psychosis, she
14 did testify that the defendant might be exhibiting signs of a prodromal (as yet emerging)
15 psychosis, given his age and decline in function. (*Id.* at 89-90.) Dr. Kaempf did not perform
16 any tests on the defendant, but rather relied on the information in Dr. Simpson's evaluation.
17 (*Id.* at 95, 110.) She did agree with Dr. Simpson that it is very difficult to distinguish
18 between strong religious beliefs and a mental disease which renders someone incompetent.
19 (*Id.* at 96, 100-101.)

20 At the conclusion of the hearing on December 16, 2015, the Court advised the parties
21 that a neuropsychologist was going to be appointed to conduct another evaluation of the
22 defendant. The Court ordered this examination for several reasons: (1) Dr. Simpson did not
23 perform a competency examination; (2) Dr. Kaempf's examination involved no testing  –
24 other than her reliance on Dr. Simpson's testing conducted during his psychosexual
25 evaluation – and consisted only of a one hour interview of the defendant and a short
26 interview of his mother; and (3) neither doctor was able to adequately explain why the
27 defendant's strong religious conviction, in and of itself, was the result of a mental disease or
28 defect, given that he was an otherwise intelligent, fully functioning young man who

1 understood the legal process and the consequences of not cooperating with his attorney. The
2 parties agreed on Dr. Marisa Menchola to conduct the neuropsychological examination.

**Dr. Menchola's Report:**

Dr. Menchola submitted a report dated February 9, 2016, which detailed her clinical interview of the defendant, the neuropsychological tests she conducted and the results of those tests, and her conclusion that the defendant was competent to stand trial. Like Dr. Kaempf, Dr. Menchola found that the defendant's intellectual abilities, memory functions, and attention and executive functions were normal. (Ex. G at 5-6.) Dr. Menchola concluded that the defendant showed "no evidence of a neurocognitive disorder or other cognitive impairment" and found his "high average abstract reasoning and superior cognitive flexibility . . . noteworthy." (*Id.* at 10).

Dr. Menchola disagreed with Dr. Kaempf that the defendant's strong religious conviction suggested prodromal psychosis or a schizotypal personality disorder. (*Id.*) She concluded that both possibilities are "unlikely" because there was no evidence of functional decline and his only "odd beliefs" or "magical thinking" related to his faith-based beliefs which are shared by his family and faith community. (*Id.*) She also concluded that the defendant has an adequate factual and rational understanding of the legal proceedings and nature of the charges against him, and that he possesses the ability to cooperate with counsel. (*Id.* at 11.) Ultimately, she concluded that the defendant is fully able to cooperate with his attorney, but is "willingly choosing" not to cooperate and understands the potential consequences of that choice. (*Id.*)

After receiving Dr. Menchola's report, the Court set a status conference on February 16, 2016, to address her findings and conclusion. At the status hearing, neither party was willing – quite understandably – to stipulate to either a finding of competency or incompetency based on the prior testimony and/or the reports of the examinations of the defendant. The Court concluded that given the apparent conflict between the conclusions reached by Dr. Kaempf and Dr. Menchola regarding the defendant's competency to stand trial, an evidentiary hearing where Dr. Menchola would testify about her examination,

1 findings, and conclusions was warranted.   That hearing was set for March 1, 2016.

2 **Dr. Menchola's Testimony at the Evidentiary Hearing on March 1, 2016:**

3    Dr. Menchola's testimony was consistent with her report; specifically, that her
4 examination of the defendant revealed that he suffers from no neuropsychological deficits,
5 and that she did not find any evidence of a mental illness that accounts for the defendant's
6 religious beliefs and his refusal to cooperate with his attorney.  (3/1/16 Tr. at 7-8, 16.)[4]  Dr.
7 Menchola testified that the defendant's religious beliefs are not uncommon or unusual, even
8 though they may appear to be at first blush.  (*Id.* at 19-20.)  She explained that she has
9 conducted over 100 competency examinations and that in her experience she has seen
10 defendants who are uncooperative and make choices that seem ill-advised because of their
11 religious beliefs.  (*Id.* at 29-30.)  Moreover, she has seen defendants who have difficulty
12 admitting guilt when the admission would be contrary to the values of the church or church
13 community.  (*Id.* at 30–31.)  That is certainly the case with respect to the defendant given his
14 family and church community.  (*Id.*)  Finally, she has seen defendants  refuse to admit guilt
15 or cooperate in cases involving sex offenses, because those defendants have a long history
16 of denial.  (*Id.* at 30.)

17    Dr. Menchola also testified that the defendant's refusal to consider a plea agreement
18 is explained by a completely rational reason aside from his religious beliefs.  That is, the
19 defendant's admission to her that even absent his faith, he would still likely reject a plea and
20 go to trial because a conviction would destroy his life and future. (*Id.* at 35-36.)  Dr.
21 Menchola believes that this admission further shows that the defendant is fully able to
22 cooperate with his attorney and discuss a plea offer or trial strategy, but is making a choice
23 not to do so.  (*Id.*)   Thus, Dr. Menchola's conclusion is that the defendant is competent to
24 stand trial.  (*Id.* at 40.)

25 **Discussion:**

26    A defendant is competent to stand trial if he is able "to understand the nature and

---

[4] "3/1/16 Tr." refers to the transcript of the evidentiary hearing held on March 1, 2016.

- 7 -

1 consequences of the proceedings against him" and to "assist properly in his defense." 18
2 U.S.C. § 4241. The government has the burden of demonstrating by a preponderance of the
3 evidence that the defendant is competent to stand trial. *United States v. Hoskie*, 950 F.2d
4 1388, 1392 (9th Cir. 1991). The Supreme Court has held that in determining if a defendant
5 is competent to stand trial, a district court must determine "whether [the defendant] has
6 sufficient present ability to consult with his lawyer with a reasonable degree of rational
7 understanding - and whether he has a rational as well as factual understanding of the
8 proceedings against him." *Dusky v. United States*, 362 U.S. 402 (1960); *see also Bills v.
9 Clark*, 628 F.3d 1092, 1098-99 (9th Cir. 2010).[5]

10 A court's determination of competency is a factual, rather than a legal determination.
11 *United States v. Mackovich*, 209 F.3d 1227, 1232 (10th Cir. 2000). In determining
12 competency, a court "may rely on a number of factors, including medical opinion and the
13 court's observation of the defendant." *United States v. Boigegrain*, 155 F.3d 1181, 1189
14 (10th Cir. 1998).[6] In cases, such as this one, with multiple experts, a district court may find
15 a defendant competent by adopting the findings of one expert and discounting the contrary
16 findings of another. *Miles v. Dorsey*, 61 F.3d 1459, 1472-74 (10th Cir. 1995).[7]

17 A defendant who suffers from a mental illness may still be competent to stand trial,

---

[5] More recently, the Supreme Court has recognized that requiring a criminal defendant to "be competent has a modest aim: It seeks to ensure that he has the capacity to understand the proceedings and to assist counsel." *Godniez v. Moran*, 509 U.S. 389, 402 (1993).

[6] Although the defendant did not testify at either evidentiary hearing, the Court has observed the defendant's demeanor at several court hearings and has had discussions with the defendant about his performance on pretrial release and this competency issue. He has been well-mannered, courteous, and respectful at all court hearings, and is well-spoken and articulate. The defendant told the doctors, and the Court, that he does not believe that he is mentally ill, incompetent or abnormal. (3/1/16 Tr. at 16-17; 12/16/15 Tr. at 126.) However, he is aware that people perceive his beliefs to be unusual, crazy or insane. (3/1/16 Tr. at 17.)

[7] As discussed in text *infra*, this Court adopts the findings and conclusions of Dr. Menchola and discounts the contrary findings and conclusions of Dr. Kaempf.

1 even if the defendant exhibits "bizarre, volatile and irrational behavior." *Medina v. Singletary*, 59 F.3d 1095, 1107 (11th Cir. 1005); *see also Boag v. Raines*, 769 F.2d 1341, 1343 (9th Cir. 1985) (defendant's diagnosis as a sociopath did not render him incompetent because it had no bearing on his ability to understand the proceedings or consult with his attorney). Relatedly, a defendant's choice to make seemingly irrational decisions, or not to communicate or cooperate with his attorney, does not support a finding of incompetence if the defendant has the capacity to assist in his defense despite not doing so. *See United States v. Ghane*, 593 F.3d 775, 781 (8th Cir. 2010) (disagreement with one's attorney does not make a defendant mentally unable to consult with his attorney); *United States v. Ferrer-Hernandez*, 2013 WL 594261, at *6 (N.D. Iowa Feb. 15, 2013) ("[D]enying the facts in the face of contradictory evidence does not make one delusional. Instead, it may simply represent a defendant's unsophisticated effort to avoid the consequences of his actions.").

*United States v. Battle*, 613 F.3d 258 (D.C. Cir. 2010) is similar to the case at hand in that it involved the issue of whether a defendant was unable or unwilling to assist his counsel given his grandiose delusions with strong religious beliefs. Moreover, *Battle* also involved conflicting conclusions from two doctors concerning the defendant's competence to stand trial. In that case, the district court found the defendant competent notwithstanding a clinical psychologist's opinion that the defendant was not competent because his delusions were "almost certainly psychotic in nature and precluded his working with his attorney effectively." *Battle*, 613 F.3d at 260. A forensic psychologist who examined the defendant at the Federal Medical Center found that the defendant did not appear to suffer from delusional thinking, and while his personality characteristics were likely to result in significant difficulty in working with his attorney, his refusal to cooperate was volitional and the result of a conscious choice, and not the product of a mental defect that the defendant could not control. *Id.* at 261. The Court of Appeals affirmed the district court's finding of competency, holding that uncooperativeness with one's counsel does not alone prove inability to assist; rather, the relevant legal question was not whether the defendant will "assist properly in his defense" but whether "he [is] able to do" so. *Id.* at 263.

Here, based on the testimony of all three doctors, there is no question that the defendant has an adequate factual and rational understanding of the charges against him and the consequences he faces. All three doctors testified that he is an intelligent young man and has a good understanding of how the criminal justice process works, including the role of the prosecutor, his attorney, the judge, and the jury, as well as his options of pleading guilty or proceeding to trial. The only issue is whether he is unable to assist his attorney because his firmly held religious beliefs stem from a mental disease or defect. As in *Battle*, this Court concludes that the evidence establishes the defendant's religious beliefs are not the result of a mental disease or defect and that he is able, but is unwilling, to assist his attorney.

Dr. Menchola concluded that the defendant does not suffer from any neuropsychological deficits, and she is the only doctor who performed testing to rule out that possibility. She also did not find any evidence of a mental illness that would account for his religious beliefs. All three doctors testified that defendant does suffer from depression, but this mental health condition is prevalent in society and understandable here given the charges facing the defendant. Moreover, no doctor testified that the defendant's depression is so severe that it renders him unable to assist his attorney. Like in *Battle*, Dr. Kaempf and Dr. Menchola do disagree about whether the defendant's strong religious conviction suggested prodromal psychosis or a schizotypal personality disorder which rendered him unable to assist his attorney. Dr. Menchola concluded that both possibilities are "unlikely" because there was no evidence of functional decline and his only "odd beliefs" or "magical thinking" related to his faith-based beliefs which are shared by his family and faith community.

The defense argues that Dr. Menchola's "conclusion that these beliefs were culturally normative" is based on "very thin and inadequate information." (Def. Supp. Mem. at 7.) Specifically, the defense claims that her conclusion is not based on the "exact sub-cultural group" to which the defendant belonged – *i.e.*, his Pentecostal faith – but rather her work with various cultural groups in her practice where similar irrational beliefs, such as faith healing, were accepted and normal. (*Id.*) Moreover, the defense complains that Dr. Menchola based her conclusion on the fact the defendant himself told her that some of his

1  family members and his pastor share or support his beliefs, but she never spoke with these
2  people or conducted research about the defendant's faith community. (*Id.* 7-8.)  The defense
3  claims that the defendant was "an untrustworthy source for this information" because all
4  three doctors concluded that the defendant was reverse malingering – trying to make himself
5  look healthier and "normal." (*Id.* at 8.)   For these reasons, the defense argues that Dr.
6  Menchola's conclusion as to competency should be disregarded.

7  Instead, the defense argues that the Court should rely on Dr. Simpson's testimony
8  because he was raised in the Pentecostal faith and culture. (*Id.*)  Moreover, he is familiar
9  with the defendant's sub-cultural group because he attended this same church, knows the
10 pastor well, and spoke with him and the defendant's mother about this case. (*Id.*)   The
11 defense maintains that this unique perspective allowed Dr. Simpson to testify with
12 uncommon authority that the defendant's beliefs were not normative in his sub-culture. (*Id.*)

13 The defendant's argument that this Court should completely disregard Dr. Menchola's
14 testimony and instead rely on Dr. Simpson's unique perspective is faulty for several reasons.
15 First, Dr. Menchola is the only doctor who performed tests to rule out whether the defendant
16 suffered from a neurocognitive disorder or other cognitive impairment.  Dr. Simpson did not
17 even conduct a competency examination of the defendant; if he had, he would have
18 conducted additional tests to determine competency. Dr. Kaempf's examination consisted
19 only of meeting with the defendant for an hour and a short conversation with his mother; she
20 performed no testing and instead relied on Dr. Simpson's report of his psychosexual
21 evaluation.  Moreover, in her report, Dr. Kaempf was on the fence as to whether the
22 defendant was incompetent.  While she did ultimately testify that she believed the defendant
23 was incompetent, as discussed below, she could not adequately support that conclusion when
24 confronted with the defendant's statements to Dr. Simpson that the defendant had previously
25 discussed legal strategy with his lawyer and felt like he was being ignored.

26 Second, Dr. Simpson testified that the defendant's mother shares the same belief as
27 the defendant that faith in God will somehow take care of the criminal charges.  Indeed, he
28 testified that those beliefs are common in the Pentacostal faith and perhaps a learned familial

pattern, but those beliefs alone would not make a person incompetent because they were unable to assist his/her attorney. Those facts further evidence that the defendant's beliefs are the product of his religion, faith, and/or family, and not a mental illness.

Third, Dr. Menchola testified that she has performed many competency examinations on individuals – ultimately found to be competent – whose cultural or religious beliefs result in decisions that others would consider irrational. (3/1/16 Tr. at 20.) In fact, she has worked with patients in the medical setting that were Pentecostal or identify as Pentecostal. (*Id.* at 12.) As such, there is nothing unique about the defendant's sub-cultural religious beliefs that would undermine Dr. Menchola's ability to conduct a competency assessment or her conclusion.

Fourth, Dr. Menchola testified that, in her experience, individuals charged with sex offenses against children also have a difficult time in admitting to interest in children, and a Pentecostal belief system could contribute greatly to that inability to admit this type of interest. (*Id.* at 31.) Those facts also lead to the conclusion that external sources, and not mental illness, are impacting the defendant's ability to cooperate with his attorney.

Finally, but importantly, Dr. Menchola addressed an issue that had not been raised in the prior evaluations or testimony of other doctors, that being, the defendant's "defiance" in his refusal to consider a plea agreement even if he did not have his strong religious beliefs. (*Id.* at 35.) When Dr. Menchola talked with the defendant about a plea agreement, he said something to the effect of: "I'm not going to just sign. Why would I sign my freedom away? This is going to ruin my life. I would put up a fight." (*Id.*) Dr. Menchola took these statements to mean that: "If you want to put me through hell, I'm going to take you to hell. You are not just going to take my life away."[8] (*Id.*) The defendant's statements regarding considering a plea agreement further show that he is able to discuss a plea agreement with

---

[8] The doctors testified that during their interviews the defendant could and did discuss plea agreements in the abstract or in a hypothetical case - in terms of the advantages and disadvantages to accepting a plea agreement versus taking a case to trial – but refused to discuss the plea agreement offered in his case because to do so would violate his religious beliefs. (12/16/15 Tr. at 47, 115-116; 3/1/16 Tr. at 28.)

his attorney, but he is unwilling to do so because a conviction will ruin his life.

Relatedly, the defendant made statements to Dr. Simpson about his attorney's refusal to listen to him in terms of legal strategy, which also show that he has been able, but is not now willing, to assist his attorney in his defense. In Dr. Simpson's report, he notes that:

> Mr. Merritt stated that no one is listening to my ideas, like they didn't have a warrant. They, the police, asked for my keys. I gave them my keys. Something went wrong with the whole process. I keep trying to tell my lawyer and they keep trying to bring this issue up with my brother. Defendant discussed that if the police didn't have a warrant, they didn't have what they needed to get what they did. My mom is the owner of the house.

(12/16/15 Tr. at 113; Ex. B.)

At the evidentiary hearing, after the Court read this statement to Dr. Kaempf, the Court asked the following question: "isn't that statement showing the ability to discuss this case with his attorney?" (12/16/15 Tr. at 113). Dr. Kaempf responded:

> It could be. And it's somewhat striking because that suggests he would be interested in participating in his defense; yet, he's – he's not, which that contradictory kind of nature of he thinks he should be acquitted, the charges should be dismissed; yet, he's not willing to discuss a plea agreement or any trial strategies is concerning.

(*Id.*) The Court then asked Dr. Kaempf: "But doesn't it suggest that he's able, but not willing?" (*Id.*) Dr. Kaempf responded: "I don't know. I wasn't present for that conversation. It suggests some willing - some ability to discuss his case, but he's not discussing his case." (*Id.* at 113- 114.) That response is troubling because it begs the question of why Dr. Kaempf did not even address the defendant's purported prior cooperation with his attorney during her interview of the defendant, given that this fact was noted in Dr. Simpson's report, which she relied upon, and because that is the ultimate issue in the matter at hand. The failure to explore this important point, in this Court's view, undermines Dr. Kaempf's findings and conclusion that the defendant is unable to assist his attorney.

The Court put this same line of questioning to Dr. Simpson, since he was a participant in this conversation with the defendant. Like Dr. Kaempf, Dr. Simpson was also befuddled by the defendant's statements about his prior discussions of legal strategy with his attorney, given his unwillingness to do so now. Dr. Simpson testified that: "Again, it's kind of a

- 13 -

1  confusing picture that I put before the Court, but he's – in some aspects, he's engaged with
2  his attorney, and is talking through and doesn't feel listened-to, you know. And yet, on some
3  key elements, I felt like he – he wasn't engaging. And that's – that's why I raised the red
4  flag to say, I think this needs to be explored more." (*Id.* at 66.)

5  The Court finds that it was understandable and prudent for Dr. Simpson to raise the
6  red flag about the defendant's competency given his utter refusal to cooperate with his
7  attorney because he believes that God will ensure the charges are dismissed. Both that belief
8  and decision obviously seem irrational to most, and there are dangerous consequences to
9  maintaining both as this case progresses to trial. However, based on the evidence presented
10 in the doctor's reports and their testimony, including the defendant's statements to Dr.
11 Simpson (about his attorney's refusal to listen to him about strategy) and Dr. Menchola (that
12 he would never plead guilty even absent his beliefs because a conviction will ruin his life),
13 this Court finds that the government has proven by a preponderance of the evidence that the
14 defendant's religious beliefs are not the result of a mental disease or defect, and that he is
15 fully able to assist his attorney.

16 Accordingly, this Court recommends that the District Court find that the defendant
17 is competent to stand trial.

18 Pursuant to 28 U.S.C. §636(b)(1)(B), the parties have fourteen (14) days from the date
19 of this Report and Recommendation to file written objections to these findings and
20 recommendations with the District Court. Any objections and Responses to objections filed
21 should be filed as CR 14-02147-TUC-RCC. No Replies shall be filed unless leave is granted
22 from the District Court.

23 Dated this 23rd day of March, 2016.

Eric J. Markovich
United States Magistrate Judge